We will hear argument next in Case No. 15-138, RJR Nabisco v. European Community. Mr. Katsas. Mr. Chief Justice, and may it please the Court, the Second Circuit extended civil RICO to claims involving foreign injuries, foreign enterprises, and foreign patterns of racketeering. Its holding is wrong for two reasons. First, RICO's private civil cause of action does not provide redress for foreign injuries. And second, RICO's substantive prohibitions do not reach the infiltration and corruption of foreign enterprises. As to the first point, Respondents have now abandoned any allegation of domestic injury. That is fatal to their case, because Section 1964c, the private right of action in RICO, is limited to domestic injuries. Two related and mutually in. Ginsburg. If the statute is related, the statute doesn't say domestic injury, does it? The statute says injury, Justice Ginsburg, by application of the presumption against extraterritoriality. Injury is the focus of Section 1964c, and therefore, injury is limited to domestic application absent a clear indication to the contrary. That is a straightforward application of this Court's decision in Morrison, which says you identify the focus of the provision before you and you limit it to domestic application unless Congress says otherwise. Ginsburg. Then you are making a distinction between RICO when the government is using it as a prosecutorial tool and RICO as a distinction? Yes. We are making a distinction between Section 1962, which is the underlying criminal prohibition, and Section 1964c, which is the private civil right of action. Different provisions in statutes can have different foci, as Morrison itself made clear in separately analyzing Section 30 and Section 10b of the 34 Securities Act. And here, the difference between the substantive prohibition and the private right of action is clear from this Court's private right of action jurisprudence over the last 30 or 40 years, which make clear that the decision to prohibit certain underlying conduct is fundamentally different from the decision to provide a private right of action for violation of substantive law. That's why Section 1964c has a different focus. You don't automatically assume that because Congress criminalized the conduct, it intended for the private right of action to follow along to the same extent. Mr. Katsas, can I ask a question that this is an analytic question, not necessarily at all an argument that your result is wrong, but I guess I'm confused by what you said now and what you say in the briefs, that this is a matter of looking to the focus of the statute. Because my understanding of Morrison is that this whole focus inquiry came in at the second step of the analysis. In other words, once the Court had decided that the presumption against extraterritoriality had not been rebutted, then there was an additional argument that had been made like, oh, well, this really does involve domestic conduct. And so the Court used this focus test to decide whether it was the domestic conduct or the extraterritorial conduct that was the focus of the statute. But that doesn't seem to answer the question whether the presumption is rebutted at all, and it doesn't seem to answer the question that I think you're trying to get at, and it's an important question, as to whether we look at that presumption question section by section or for the statute as a whole. Katsas, I think the rule that emerges from Morrison is that what has to be domestic is the statutory focus. Morrison is section 10b, and there were two choices. There's the element of deception, and there's the element of the securities transaction, and it's foreign transaction, domestic deception. And the Court says, no clear indication. Congress can obviously provide for or prohibit extraterritorial application if they do that clearly. If they don't do that clearly and the presumption is going to operate, you have to figure out whether the focus of the statute is one element or the other. And they said the focus is the transaction, and therefore that is what has to be domestic. And because the transaction in Morrison was foreign, the application of the statute was impermissibly extraterritorial. Kagan. Kagan. I guess I just would have thought that the question is whether these are discreet provisions in some way, such that a conclusion as to the extraterritoriality of one doesn't really affect, doesn't tell you anything about the extraterritoriality of the other. And it seems much less important as to what the focus of the statute as a whole is, even, you know, if one could answer that question. There will always be a question. If you have related provisions, there will always be a question of whether the focus of one element in a statute carries over to the other. This case, on the question of injury, the issue before you is whether section 1964C, the private right of action, has its own focus, or whether it just travels over to the other. Breyer. Look at the first example of what Justice Kagan is talking about, Appendix B of the government's brief, 18 U.S.C. 37B, jurisdiction over acts of violence against a person at an international airport outside the United States if the offender is found in the United States. Now, I can understand why they would make that a crime. Why would they put it in RICO unless they wanted somebody who was hurt to be able to get damages? Well, the person who was hurt as to the injury. The injury is somebody at a foreign airport.  And RICO is limited to recovery for business or property. Breyer. Well, suppose a business is hurt. I mean, you know, they blew up an airport in Tasmania, okay? So I guess that blowing up an airport there could hurt somebody. But my question is what's it doing in RICO if, in fact, Congress doesn't intend a foreign person hurt to be able to get damages? It's already a crime. And maybe this is a wrong example. Think of they have a list of about 50. Right. Okay. Some of them I can ask this question to. What's it doing in RICO unless they want somebody to get damages? There are something on the order of 200 predicate statutes that are in RICO. And the Solicitor General's appendix cites about 46 of them which have extraterritorial application. All but seven of those statutes have domestic as well as extraterritorial application, including the one you just read. When you look at the government's appendix, what many of those statutes do is they take a statute, statute has domestic application, and then there's a provision that extends it extraterritorially. And what's quoted in the government's brief is the extension for extraterritorial application. So I think what your question goes to is, well, what about the one — what about statutes that are exclusively extraterritorial? There are seven of them. Only — only one of them out of the 200 RICO predicates was specifically mentioned in RICO as one statute that it should have plotted. It is— Breyer. The answer to my question is, four words, it was an accident. That's the answer. No, I'm not saying it was an accident. Well, then, if it was not an accident, explain to me the same question. I don't want to repeat the same question five times. All — all but the vast majority. No, there's some. Let's look at the ones that were not, that are of the seven, or if you want, the three. Why would a human being — now, you've got my question. Yes. Why is it in RICO if they don't want damages? Let's — let's talk about the one that I mentioned. It's 18 U.S.C. 2260. That provision addresses child pornography offenses abroad with an intent to import into the United States. That provision has perfectly meaningful application for people who suffer — people who suffer domestic injuries and for United States enterprises, United States racketeers who could use domestic enterprises to violate that provision. And even if I were wrong about that, Justice Breyer, I don't think you would use the one provision out of 200 as the basis for saying that the statute that on it, in the heartland of its application, will do lots and lots and lots of meaningful work when it's applied to domestic injuries. The related point, this isn't just the presumption against extraterritoriality. We also have the background common law rule that causes of action to redress private injuries are governed by the law of the place of the injury. Here, we have only foreign injuries. Congress legislates against the background common law rule. And just as the cause of action in RICO picks up background common law rules, approximate cause, so, too, it picks up this Lex loci delecti rule, again, absent some clear indication to the contrary, when you look for a clear indication with respect to the question of injury, not only don't you find a clear indication to the contrary, you find in the statutory findings in RICO a repeated and specific and exclusive focus on the domestic effects of racketeering. As Congress has identified its concern, it is impact on the American economy from racketeering. Certainly no clear indication to extend the cause of action to foreign harms. Kagan. Well, that may have been true or largely true at the beginning, but how about all these amendments that happened after 9-11, which clearly seem focused on foreign conduct, foreign organization, foreign harm? There is one amendment that is cited. It's the Patriot Act, which does one thing to RICO. It expands the list of predicate statutes to include one provision, 2232 G.B.5b. It's a reference to that statute.  The list has 60 or so terrorism-related predicate crimes. Fifty-eight of those crimes have domestic application. Kagan. Well, possibly they have some domestic application, but if you ask, like, why did Congress pass this amendment at this particular moment in time, what was, I mean, recognizing that it's sometimes hard to figure out what was in people's heads, I mean, don't you think that what was in Congress's heads at that moment in time was foreign terrorist organizations committing terrorist conduct on foreign soil? We don't know for sure. I'll give you another possibility, which is what they had in mind was the September 11 attacks, which were domestic acts of racketeering. When they incorporated that list that I mentioned, the very first statute on that list is destruction of a commercial aircraft. Which is a very effective statute. Kagan. Well, that at least suggests foreign organizations, even as to that. I'm sorry? That at least suggests foreign organizations. Well, that explains the incorporation of the predicates relative to the events of September 11. But in any event, with respect, I don't think that's the right question, because where the presumption applies, either on the question of injury, which I've been discussing, or on the question of enterprise versus pattern, again, the rule for Morrison is that you identify the focus and then you need a clear indication in the statute to the contrary. How do you deal with Judge Lynch's example? It is a foreign terrorist organization. It operates only abroad, but it repeatedly cuts off the heads of U.S. citizens. That would be a foreign terrorist organization operating only abroad, but its targets  I think the underlying acts would be criminally prosecuted and could be punished very severely. RICO, if I understand the hypothetical, the organization is foreign, in our view, RICO doesn't cover that. Here's why. Either civilly or criminally. Correct. Because now, if I'm turning to section 1962, our position is that the focus is on the enterprise, and I understand the hypothetical to be a foreign enterprise doing a lot of very bad things. And doing bad things to U.S. citizens. It's the example, the section that makes that a crime is 2332a1. And 2332a1 would be prosecutable by the government, and the people who did those bad things probably would face the death penalty. Ginsburg. So you're saying only the act itself, you can't superimpose RICO, because there's been a whole pattern of these. They've cut off a hundred heads. If it's a foreign enterprise, that's right, and here's why. Because you have to evaluate that hypothetical in the context of RICO. The hypothetical is designed to make it hard for me to make it seem as though the enterprise is the bad actor. But under section 1962c, the enterprise is the victim of the corrupting conduct, even in your hypothetical. The enterprise is legally distinct from the person, the person is the defendant, the person doing the corrupting. Moreover, the hypothetical you described, the pattern itself is not actionable under RICO. Ginsburg. Judgment in that, in his opinion on the NBAC, he said, Because the focus of section 1962 is the enterprise, and under Morrison, the enterprise has to be domestic, absent a clear indication to the contrary. All of those predicate crimes are addressed by the underlying criminal statutes. RICO doesn't prohibit the pattern. What it prohibits is infiltration and corruption of the enterprise. Think about the point of RICO is that it does both. It says a pattern of conduct, and it links that pattern of conduct to the enterprise. And it seems to be, you know, a little bit of a fool's errand to decide which the focus is, when RICO is clearly something that melds the two and says there is a pattern of conduct and it relates in various kinds of ways to an enterprise. Perhaps. But you could have said the same thing about Morrison, under which you need both deception and a securities transaction in order to have a section 10b violation. So. Well, the fact that some things can be separated doesn't mean that everything can be separated. And the question is, how is it possible to understand RICO except as something in which these things are intermelded? And at the very least, one is not prior to the other or more important than the other. I mean, if we are going by our cases, we have said about 100 times that it's the predicate acts that are the foundation of RICO. Congress has told you in the statutory findings what they are concerned about. It is infiltration and corruption of domestic enterprises. Consistent with that is the structure of section 1962, three different provisions. In each of them, the enterprise the enterprise is the victim of the corruption. It's not the person doing the corrupting. Particularly obvious with respect to section 1962a and 1962b, right? The racketeer uses proceeds to invest in an enterprise. Enterprise is the victim. That's the object of Congress's concern. Even with regard to 1964c, the typical case they have in mind is infiltration and corruption of a domestic enterprise, straight out of the findings. Ginsburg. You would say, I mean, another example Judge Lynch gave is the Sicilian Mafia commits a series of violent crimes in the United States that would violate RICO if committed by a New York-based mafia family. But so the New York-based mafia family, RICO applies. Sicilian-based does the very same act, doesn't apply. That's your position, right? That's right. The concern about the crimes is addressed by other statutes which criminalize  When the Sicilian Mafia commits a series of violent crimes. But not the pattern. It's just that the statute gets that after the individual instance. RICO says when you have a pattern, things are a lot tougher for you. It says when you have a pattern that impacts an enterprise. And if I could just get on the table the question about the 1964c issue with regard to domestic enterprises, the paradigmatic case that Congress has in mind, the racketeers infiltrate the union, use racketeering proceeds to take it over, that's the 1964a violation, and then they use the union to do bad things, to extort money from its members or whatever. That's a case in which the union is the vehicle for racketeering, but it's not the racketeer. It is the victim of criminal conduct. The conducting the affairs of the union in that way is an example of corrupting conduct. I'd like to just get one more thought on the table on the injury point before I sit down, which is this Court's decision in Empagran, where you applied the presumption and related principles of comedy to a case involving foreign injuries caused by primarily foreign conduct. And you said it would be so unreasonable to do that as to violate customary international law. That is exactly what we have here. If you look at the complaint, the underlying conduct that Respondents say injured them are a series of foreign transactions. And you can resolve this case based on Empagran alone if you wish to not write more broadly. I'd like to reserve the balance of my time. Roberts Thank you, counsel. Ms. Goldenberg. Goldenberg Mr. Chief Justice, and may it please the Court. I'd like to talk about both the enterprise and the injury points, but I'd like to start with the enterprise point, because section 1962 most directly affects the government's ability to bring RICO prosecutions and RICO civil actions. As some of the questions have pointed out, there are a number of predicates that are incorporated into RICO into the definition of racketeering activity that have extraterritorial application. Some of them have solely extraterritorial application, and that is a clear indication that RICO itself extends extraterritorially to the extent that the predicates that are alleged in the case do. And that is true both of the pattern itself, the conduct of the crimes, and also of the enterprise. And you can see that if you look at the kinds of predicates that we're talking about here. As was observed earlier, many of them were incorporated into RICO after 9-11. Many of them involved terrorist conduct. And the natural way in which the provisions would operate, and Congress would have understood this, is that they would have swept in activities by foreign enterprises as well as the foreign conduct itself. We've given a number of examples of those kinds of provisions in our brief, the killing of a U.S. national abroad, taking U.S. hostages abroad, shooting at aircraft with U.S. citizens abroad with missile systems. There's another example that is, I think, a very clear one, that is section 2339d, which is receiving military-type training from a foreign terrorist organization. Although I suppose it is possible that somebody could go and receive that training in connection with their activities with a domestic enterprise, the very natural operation of that provision is going to be that they're going to be carrying out the affairs of a foreign enterprise, in fact, a very foreign terrorist organization that is holding the military-type training and has those training camps. And so we think that it's clear that the provision has the — that section 1962 has extraterritorial applicability, both with respect to the foreign pattern of conduct and with respect to the enterprise, to the extent that a predicate with extraterritorial applicability is implicated. I've heard Petitioners talk about two reasons why they think that might not be true, both of which I think are incorrect. One is that the government could just prosecute the underlying crimes themselves and not use RICO. And the other is that, well, in situations in which you have some people in the United States, you could kind of break them off and call them a domestic enterprise. And I don't think either of those is a workable approach to section 1962. With respect to just prosecuting the underlying crimes, of course, the very point of RICO was that Congress thought where there were patterns of serious crimes, that just prosecuting the crime itself was not a strong enough tool for the government, and that it was important for the government to have the special advantages that RICO confers in order to root out the things that are causing these patterns of crime. Roberts. But RICO imposes, it seems to me, as we've even observed in the domestic context, far more significant — the impact internationally could be far more significant than prosecution simply of the underlying offenses. It obviously provides the government with extremely strong prosecutorial reach and penalties far beyond what the substantive elements do. And I'm wondering why that shouldn't cause us to be more concerned with respect to the comity interests that are at stake when you're talking about extraterritorial applicability. I think as this Court observed in Empagran, where you're talking about section 1962 or something like section 1962, where it is the government that is choosing whether to prosecute or whether to bring a civil action, the government has the ability, it has the incentive to take those kinds of concerns into account and to regulate itself, either to be constrained in bringing that kind of action where it might cause some comity concerns, or to deal government to government with another government to try to make sure that those comity concerns are smoothed over, it's on the private side, under section 1964c, where you have private parties bringing treble damages actions, that the concerns about comity, I think, are much greater, because private parties don't have that same ability or incentive to regulate when they're bringing actions, they are trying to get their treble damages. Breyer, I thought this was the same question, but it's — I'm elaborating a bit, because it's both for you and Mr. Frederick's reading. I thought the answer to my first question would be that the government just wanted the forfeiture provisions. That's why it put them in. Or the criminal provisions, that's why it put these other things in. And you say that's right. You say, but they didn't want the damages to extend abroad. That's your position. Yes, that's correct. You wrote it into your brief. Yes. And you're the State Department for this purpose, and you ought to know. But then they're the EU, and moreover, not only do they tell us that the 27 nations of the EU don't agree with you, but in fact, what's very confusing about this is in the Alien Tort Statute case, which, after all, involved torture and not simply money laundering. The EU countries, at least three, were in here with briefs. I think it was Germany, the Netherlands and Britain, saying, stay out of this stuff. Not completely, but basically. And you were on the other side. Okay, so what's going on? That is, I mean, and it's not just a — that's not a criticism. We have to write this. And I think what you think and what those countries think is very important in matters like this. And here they're taking what seem to be contradictory positions. Who do you talk to? Who do they talk to? Is this the right hand not knowing what the left hand is doing in Britain and in Germany? Is it that no one actually spoke to anybody except a lawyer at the EU, and then the right hand spoke to anybody in any of the relevant ministries of justice or embassy? Is it that you actually went and talked to the ambassadors of England, Germany, the Netherlands, and asked them, why do you want us to take a different position in this case than you — it seems to be — than you took in the other case? I mean, I have a few pages here. I can't work with a few pages. I have no idea what the right result is here in one important aspect, unless I know what, after thought and consideration, you, the State Department, and those other countries and their ambassadors, et cetera, actually think. Do I have enough here to deal with it? What do I do? Well, I think you do have enough here to show what we actually think, Mr. Frederick. Did you consult with the embassies? Did the State Department go out and ask them to have their legal departments over in Germany look up what the actual effect would be of the damages? Or was it the EU that bore total responsibility for this matter without even consulting from Brussels what happens in Germany or some other place? I mean, how did it work? Well, to my knowledge, we didn't have those consultations, although I understand that the EU informed the Justice Department before it filed the suit. And did it consult with the other three? You see where I'm going, and I'd like your best answer. Well, I think that this is a very unusual case where you have foreign sovereigns as the private RICO plaintiffs. I think that won't usually be true. And the rule that we are coming in here to advance is going to be the rule for the usual case as well as the unusual case. And so although it may be that, you know, the EU has special views about the comedy concerns here where it's the plaintiff, in the usual case, the plaintiff is going to be a private party, and it's going to be a situation in which the conduct and the country where that conduct and that injury took place may very well have its own interest in regulating, may not be appreciative of plaintiffs being able to come to the United States to get remedies here, particularly treble damages remedies, which, as this Court pointed out in Empegran, is something that often causes foreign countries a great deal of consternation. And if that's why it's informed on to me is the answer to that. If the question is where should, who should provide a remedy for this conduct? And if it really is centered in that other State, a form of nonconvenience motion should be made to dismiss the action because it's a far more appropriate form abroad. This Court suggested in Empegran that going case by case with these kinds of comedy concerns was too burdensome and too difficult for courts, and it would be better to make a blanket judgment about the comedy concerns with respect to the cause of action as a whole. And here, of course, we're talking not only about what court you're going to be in, but what law is going to apply. The courts of the United States are not being closed to RICO plaintiffs if they can't bring a private claim for treble damages under Section 1964c. There may be other kinds of claims that they could bring. This is a question about whether under this particular Federal statute there is a recovery that's permissible. And I was just going to say that in addition to comedy concerns, I think there are other things that point in the direction of the statute. Kagan Well, then can I interrupt and talk about your comedy concerns? Because I understand them. I mean, they seem very important. But once you say that the presumption against extraterritorial is rebutted on both the pattern of racketeering and the enterprise, once you say that, then drawing the line where you draw it seems to be very policyish. There doesn't seem to be a whole lot of law behind it. So I want to give you an opportunity to make it as law-like as you can, drawing the line here. O'Connell Sure. There are a number of things, I think. One is that just on the face of the provisions, you can see that Section 1964c is not coextensive with Section 1962. Congress chose to provide for recovery only for injury to business or property, not for personal injury, even though many of these predicates might be likely to cause personal injury. In addition to that, I think you have the comedy concerns, which are an important underpinning of the presumption against extraterritoriality. And as Petitioner's counsel pointed out, you do have this background common law rule that the place of injury is going to be the place where that's going to have the law govern whatever injury you're talking about, rather than the law of some other jurisdiction. Roberts  Mr. Frederick. Frederick, thank you, Mr. Chief Justice, and may it please the Court. The European Union and 26 of its member States brought this case in the United States against a United States corporation for the actions it committed in the United States and from the United States that had effects in Europe. This was a completely logical and natural place for this case to be brought under U.S. law. Alito Why is that so, Mr. Frederick? Isn't it rather strange that countries in Europe, member States of the European Union, are suing in the courts of the United States for injuries sustained to their business interests in Europe? Why didn't they just sue in their own courts? Frederick, Well, first, the fact that RJR has no subsidiary in Europe raised a question of personal jurisdiction that would have affected the enforceability of judgments. And you had an issue where you had 26 member States that were being affected, and the logical place for them in working together would be in a United States court, for precisely the reason that when the legal adviser in 1982 testified after this Court's FISA decision about the applicability and reciprocity of having foreign countries come to United States courts, the legal adviser testified that the United States had brought cases in over 50 jurisdictions around the world. Alito Well, are you saying that the law of personal jurisdiction in the member States of the European Union is similar to that in the United States, that they would not, under their laws, they would say they do not have personal jurisdiction over RJR? Frederick, Justice Alito, what I'm saying is that it varies among the member States. But what we do know is, the defendant, the evidence, the witnesses are here in the United States, and the allegation is that they violated U.S. law. And it is the same kind of action that the United States has brought in European member States for many, many years. Breyer, So did you, in fact, ask? Frederick, we did. Breyer, I mean, what happened there? Because, look, I'm faced with the situation where the State Department is telling me one thing. And I – it's an area I don't know about, what will really happen in international relations. That's their job. And you are representing the EU, which seems to be taking a position somewhat different than it took previously, and I want to know, who did you talk to? How did it work? Frederick, thank you for asking me this question. We presented information to the U.S. officials before the suit was filed and were absolutely neutral as to it. Furthermore, I can tell you that in 20 years of practicing before this Court, this is the single most comprehensively vetted exercise on my brief that I have ever had. EU officials have gone over every single line and compared with the positions taken by member States in other cases. And the reason why this is important to the EU and the consistency with which those are very important principles, when Congress extended RICO extraterritorially, there are one of four components that is present in every single one of the 40-some statutes that the Solicitor General puts in Appendix B. The victim is an American, the defendant is an American, the perpetrator. There is effect on U.S. interests, or there is conduct that occurs in the United States. Every one of those four components tracks with an important principle of international law, the territoriality principle, the nationality principle, the passive protective personality principle, and the protective personality. So these issues are things that Congress was considering and was aware of when it made the decision to extend these crimes extraterritorially. It posed a domestic requirement. Kennedy, if you prevail and there is a case with mostly foreign conduct and foreign injuries, and if personal jurisdiction and foreign nonconvenience are satisfied, then these actions could be brought under RICO in foreign courts, correct? Sorry, in foreign courts or in the United States? In foreign courts. Well, not under RICO. I don't think that a foreign government or foreign country would be using the law of its own jurisdiction. Kennedy, let's say a private person is injured in England, can bring a law of its own jurisdiction, I take it, bring a suit in English court and invoke RICO. Not that I'm aware of. Why not? Because I'm not aware that the English courts would apply RICO in this way. I have no brief to defend Justice Kennedy in this respect. Well, you're saying it applies extraterritorially. No. What it does, Justice Kennedy, and this is why it's actually important to go through statute by statute all of the provisions in the Solicitor General's Appendix, and we've got a binder that's got every single one of them, you can ask me about every one. Congress imposed a domestic proof requirement as to every extension of extraterritoriality for those crimes. The victim had to be an American, the defendant had to be an American, conduct had to occur in the United States, or there had to be some important interest of the United States that was at stake. If those four elements were not required or not part of the statute, then it would not track with the normal international law principles by which nations respect through comedy the regulations of conduct emanating from the shores of that country. I thought the victim here was the European community. It is, but the defendant is an American and conduct was occurring here in the United States. And if you look at the money laundering statute, Mr. Chief Justice Robertson I just thought earlier you were citing it and you said the victim is an American. One of those four, all I'm saying is one of the four, here we have two of them, if you look at the money laundering statute, conduct occurred in the United States and the defendant was in the United States national. And so international law is satisfied, comedy principles are satisfied. In those cases like the alien tort statute, where you did not have a cause of action that had been drafted by Congress, and so therefore you did not have a legislative determination of the effect on comedy interests internationally, you're left with a situation where you had judge-made law and this Court, I think, appropriately followed the guidance and advice of foreign nations, which said, be careful how far you extend judge-made law. There is a different principle at stake when there is a considered legislative judgment and the limitation on that extraterritorial impact is one that has a very clear tie to the United States. Roberts, you can easily understand, you can easily envision situations where private parties prosecuting RICO actions for or against European entities might implicate serious comedy concerns, whether the racketeering enterprise is a State-owned actor or an entity that's strongly supported by the government, and in those situations, how would the comedy concerns of the foreign government be taken into account? So it's hard for me to see, based on your hypothetical, Mr. Chief Justice, which of the predicate crimes would be assertive as the underlying pattern of racketeering. I actually thought a lot about this. Roberts, I haven't found one. Roberts, I haven't found one. Roberts, here you have a racketeering activity that goes to the illegal trafficking in cigarettes, right? So, I mean, what if, what if, and you have domestic crime predicates, what if the cigarettes were marketed through, you know, I don't know, an enterprise very important to the government of, you know, some government that sells cigarettes. You can imagine other products. In other words, it's here you have sort of an organized crime enterprise, but the way the racketeering statute works, and we have a lot of experience with this domestically, it reaches far beyond what you would have thought Congress had in mind when it used the word racketeering and certainly involves otherwise legitimate enterprises. But, Mr. Chief Justice, my point is that if you look at each one of the acts that is incorporated and has an extraterritorial component, there's a direct tie to the United States, and the crimes have to be indictable under Federal or State law. So, with respect, I think what you're hypothesizing is a situation that would be a null set, and that's where these crimes are occurring in Europe under a European membership, and if there's a tie to Federal or State laws, and somehow there's going to be a tie into RICO, that wouldn't be possible under a plain reading of the RICO statute. Ginsburg's only the statutes that have the extraterritorial and the extraterritoriality built into them. That's correct. Most statutes that are, that crimes that are punishable under RICO will have, will not have the extraterritorial provision in the underlying statute. That's correct. There are roughly three-quarters of the statutes that are incorporated into RICO that do not have an extraterritorial effect, and those would not be subject to a RICO-Claig case that would have extraterritorial consequences. Ginsburg Candidly, is, is, why is the EU suing here? Does it have something to do with no one else having a treble damage provision like RICO? Actually, treble damages are not at all the reason why this case was brought in the United States. And, in fact, if you want me to stipulate that we will not accept treble damages, I've been authorized by my clients to say that that is not what we are seeking here. What we are seeking here is a situation where an American company is operating through largely illegal cutouts and middlemen and organized criminal operators in Europe and in the Mediterranean and violating and affecting European enterprises. The complaint in this case, which is very detailed with respect to the introduction of cigarettes made and marketed in the United States, are targeted to foreign country audiences, but they are being sold through illegal channels, through Panama, through other countries, and into Europe through organized crime and drug cartel operators. I have seen the evidence for this. I have looked at the documents from RJR. I can tell you this is the most serious misconduct, and it involves very, very serious allegations that have been proved by the internal documents of the company itself. Alitoso, isn't it strange for a government to choose to sue in the courts of another country? Well, in fact, unless there's something to your personal jurisdiction point, and I really My understanding of the law of a lot of the European countries is that they have a very broad understanding of personal jurisdiction. But putting that aside, it would seem very strange to choose to sue in the courts of another country. Justice Alito, if the European nations know that they are eventually going to have to come to the United States to enforce the judgment, and there is no assets to attach in Europe by RJR because it doesn't have subsidiaries there, the simplest thing to do would be a one-step process. This suit was filed almost 16 years ago, 15, 16 years ago, and we're still at the motion-to-dismiss stage. You can imagine that from the perspective of litigation efficiency, coming into the home forum of the defendant and saying, we believe you are violating U.S. law and we seek redress for that, that is perfectly appropriate. If I could turn to the injury question, the RICO statute incorporated language of the Clayton Act, which before 1970 had been construed to permit foreign plaintiffs to come into the United States and obtain foreign damages as a result of U.S. violations by the company in the United States. The Continental Ore case, which was decided by this Court in 1962, is directly on point. That case holds that injuries suffered by Canadian entities could come in and come into the United States and get damages as a result of the violation of the Clayton Act. In Pfizer, the government of India, coupled with governments in Iran and the Philippines, came to the United States and alleged that Pfizer violated the law. Breyer, I'm just going to add, I know this, you're absolutely right on that, but the claim is that you sues an American company. Now, it's been in league with six foreign countries, and they have agreements. And what the crime is, is money laundering. And the money laundering took place in Belgium, and you win. Now, can you go to Belgium and get the damages? You see, there are six Belgian banks. They are not accused, they are unindicted co-conspirators. Breyer, does this statute allow the EU to come to Philadelphia, find RJR, accuse them of money laundering with unindicted co-conspirators in Brussels, get damages, and then go to Brussels and collect them from the other banks? I would assume that the Belgian courts, and I'm not going to profess to be an expert on the enforceability of judgments in Belgium, Justice Breyer, and so I give you that answer. Breyer, do they get a judgment against the foreign banks? They can get a judgment, well, presuming that there was personal jurisdiction in the United States. EU, the jurisdiction only against RJR, unindicted co-conspirators or helpers or whatever. I don't know the answer to your question, Justice Breyer. I think they are worried about something like this. I think that's what the State Department is worried about. Here is the answer, though. The answer is that if those Belgian banks are in a conspiracy with RJR, it surely cannot be the case that U.S. law does not cover RJR. If there is a question about the enforceability of a judgment against the Belgian banks, presumably the Belgian banks will make that argument and they will claim in Belgium that somehow a suit prosecuted in the United States in which they were co-conspirators is somehow not going to cover their activity. Our point is that it can't be the case where for centuries the United States courts have been open to allow foreign plaintiffs to come in alleging injury caused by U.S. actors under U.S. law that somehow are going to read the Morrison principle as a way of constricting the available remedies. Nothing in Morrison suggests that you would do that kind of extraterritorial slicing and dicing where once you had concluded that the underlying action here was one that observed and respected international norms and went to extraterritorial links, provided in this case that there is a tie to the United States, then whatever remedies are available are available. And after Pfizer, a number of U.S. companies were concerned about it and they went to Congress and they asked Congress to restrict it. And the hearings that we have laid out in our brief, and this is page 45, note 11, goes into the legislative history of this, and the State Department, Justice Breyer, took exactly the opposite position, because the State Department said reciprocity demands that we be allowed to go into other nations' courts and the availability of our courts for foreign nations to come in for violations of U.S. And if you look at footnote 13, which is on page 55, the State Department testified to Congress that the United States had brought more than 50 actions in nations around the world. So the idea about comedy is one that respectfully is a decision that is made by Congress, and it is not for the executive branch to change its position for the purpose of trying to snuff out a remedy that otherwise would be available to a foreign plaintiff. Kagan Well, Mr. Frederick, I understand that argument with respect to what's the ordinary remedial provision of a statute, but this is something a little bit more than that, right? Because this statute also – this provision also includes substantive elements that don't apply except in the civil suit for damages. Isn't that right? Frederick, That's true. Kagan So why doesn't that make the difference? Frederick, It could. And, Justice Kagan, if you were to decide that the three verbs that are in 1962A, B, and C, which are influencing, buying, or investing in, had to have a domestic component, we still would satisfy that, because our allegations in the complaint are that RJR from its corporate headquarters in New York and Winston-Salem was engaging in those conducts to affect and corrupt the foreign enterprise or the domestic enterprise, as was the case with Brown and Williamson. Alito Well, if we look just at 1964C and apply the Morrison analysis in a straightforward way, would that analysis work in this way? There isn't any reference in 1964C to extraterritorial application. And where would be the focus of 1964C? Would it be the injury to business or property? Frederick, So, Justice Alito, I have two responses. 64, 1964 incorporates directly 1962. So there is a direct reference to the definition of racketeering that has the sum 46 predicate acts that have a clearly textual extraterritorial effect. So I think that by incorporation you would interpret it that way. And the second thing is that when Congress used that language in 1964, it was tracking the Clayton Act. And the Clayton Act had a predetermined and pre-understood meaning as to what those words meant. Alito But at that time, RICO would not have an extraterritorial application, would it? Frederick, No. My position is that the extraterritorial application has gotten stronger over time, but that if you were to adopt the normal canon of construction, which is that when you carry with it the meaning that this Court has given those words, the same words were in the Clayton Act as they were adopted in 1970. And as Justice Kagan pointed out, the case has only become stronger with the addition of the Money Laundering and Post-Patriot Act additions of those predicate acts. But the third answer that I would give you, Justice Alito, is that even in Morrison itself, the Court's opinion says once we have found there to be extraterritorial application, it's not for us to be deciding that there are different provisions that shouldn't have that. And that's essentially the argument that is being made, is to take an extension of Morrison beyond where the Court was at the time. Breyer But the problem with the Clayton Act is even at this time, it's been a nightmare for foreign countries, and there's always been controversy around it. And there were cases called Tamberlane and others which, you know, led to the kind of thing that the SG has described in his brief. So the Clayton Act is helpful in one respect, but not helpful in the other respect. Frederick And my answer is Congress has addressed some of those concerns in the antitrust area with various amendments that affect that only go to conduct. And classically, what Congress is getting at is conduct, not remedy. But in the conduct area, what Congress has done in one of the antitrust amendments for the Sherman Act was to say we are only going to affect foreign conduct if it has a domestic effect. But it is still a focus on conduct and not on remedy. Congress is very well equipped to deal with this issue should it perceive that there to be a concern. But, Justice Breyer, I would point out that it would be odd to suppose that Congress was intending to turn the United States into a place where criminal activities could occur from the United States that was affecting our closest allies, and there was nothing those allies could do about it by going into the United States and trying to vindicate and seek redress for those harms. That would be a very, very stark departure from this country's long history of having respect and provide a remedy for foreigners who are harmed by actions of the United States and its citizens. If I could just address the — I think I've addressed the Impegrant question because that's the statute that was affected. And if I could just note that the Patriot Act, footnote 10 of our brief, points out that then-Senator John Kerry, now Secretary of State, was very conscious of the effect that this would have on foreign nations and foreign litigants. And when the Patriot Act extended certain of these predicate acts into RICO, he stated on the floor, and we cited the provision in our brief, the reason for doing that was to give foreign nations that had been affected and who were treaty allies an opportunity to come and seek redress in our courts. The last point is that Mr. Katsas noted the choice of law principle where there is a foreign injury and there is a decision to apply foreign law, and he says, why shouldn't that apply here? That only applies where there is a conflict between the laws that would apply. Here, we are asserting that there is a U.S. statutory violation by a U.S. company for actions that it committed in part in the United States. There is no reason to apply a choice of law because you have a foreign company that is — or foreign interests that are asserting a violation of U.S. domestic law. In every instance where Congress made the decision to apply RICO extraterritorially, it imposed important domestic proof requirements. That is the limiting principle on which the Court ought to decide this case. Thank you. Roberts. Thank you, counsel. Mr. Katsas, you have 4 minutes remaining. Justice Breyer, you asked about government's positions. The United States is the party that has to live with the consequences of your decision one way or the other. They are telling you here that there is a comedy problem. With respect, there is no inconsistency with what they have said before. In EMPAgran, they told you the same thing, that providing remedies for foreign injuries caused by largely foreign conduct would be a problem. The EU is here as a party in this case. But take a look at what they said in many other cases where they were in the more detached position as an amicus, in OBB, in Keeble, in SOSA, and most importantly in EMPAgran itself, which is the case involving foreign injuries caused by largely foreign conduct. They said in that case there would be a huge comedy problem with extending American law. With regard to comedy, Justice Kagan, you asked is it too policy-ish. It's not, because you have all of these background presumptions and principles. I spoke about the presumption against extraterritoriality and about the common law background rule of lex loci delecti. A third principle is the charming Betsy canon, that you construe Federal statutes not to violate international law absent a very clear statement to the contrary. And that's what we have here, because EMPAgran says that applying U.S. law to provide redress for foreign injuries caused by largely foreign conduct would be unreasonable and therefore a violation of customary international law. You also ask why draw the line at injury once you establish the underlying the underlying predicate applies extraterritorially. First reason is that the decision to create a private right of action is different from the decision to criminalize the conduct. The money laundering statute applies extraterritorially, but there's no private right of action for people injured by money laundering. The second reason is that EMPAgran applies that principle to the question of injury and specifically does so with regard to the very antitrust provisions that were in effect pre-1982, in effect when RICO was enacted, to say there's this category of cases involving foreign injury where the government can prosecute, but the private party cannot bring an action for civil redress. And that's an important distinction precisely because private parties are not constrained by prosecutorial discretion. It is aggressive to apply American criminal law, but at least the government, the Justice Department, has to talk to the State Department and take into account any comedy concerns, any problems that particular prosecutions might bring. That is not the case with respect to private plaintiffs. Mr. Roberts. Mr. Frederick said that the underlying predicates here track international law. That is true in the sense that they are written to be consistent with Section 402 of the Third Restatement of Foreign Relations, but there is an independent requirement that the application in a particular case must be reasonable under Section 403. That is the provision that you invoked in EMPAgran. That is the position, that is the problem with this case here. Finally, Mr. Frederick said this case involves United States conduct. Petitioners are four transactions removed from the original problem in Europe and two transactions removed from the cigarette sales. All of those involve European transactions and Reynolds. Alleged conduct involves transactions in Europe, Central and South America. Roberts. Thank you, counsel. The case is submitted.